**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ROSS SINCLAIRE & ASSOC.,**<br><br>  **Plaintiff,**<br><br>vs.<br><br>**PREMIER SENIOR LIVING, LLC, ET AL.,**<br><br>  **Defendants.** | **Case No.: 11-CV-5104 YGR**<br><br>**ORDER GRANTING PETITION TO COMPEL ARBITRATION AND STAY PROCEEDINGS** |

Defendants Premier Senior Living, LLC, *et al.,* bring their Petition to Compel Arbitration and Stay Proceedings. Plaintiff Ross Sinclaire & Associates brings a motion for preliminary injunction to prevent those arbitration proceedings from going forward.

Having carefully considered the papers submitted, the admissible evidence, and the pleadings in this action, and for the reasons set forth below, the Court hereby **GRANTS** the Petition to Compel Arbitration and Stay Proceedings and **DENIES** the Motion for Preliminary Injunction.

SUMMARY OF RELEVANT FACTS

The issue before this Court is whether Defendants Premier Senior Living, LLC, *et al.*, were "customers" of Ross Sinclaire & Associates for purposes of requiring that the present dispute between the parties be arbitrated before the Financial Industry Regulatory Authority. The facts

below bear on the parties' relationship and the transaction at issue. They are not in dispute unless otherwise indicated.

Plaintiff Ross Sinclaire & Associates ("RSA") is a financial firm and a member of FINRA.[1] RSA has a number of divisions, including one that provides brokerage services for customers seeking to invest in or trade securities, and one that works in public and corporate finance, including structuring, pricing and distributing bonds.

Defendant Premier Senior Living, LLC ("PSL") is a limited liability company whose sole member and manager is Aldo Baccala. Baccala is also the sole shareholder and president of Baccala Realty, Inc. and AKPF, Inc., both affiliates of Premier Senior Living, LLC. These companies, collectively "the PSL Defendants," own and operate several senior healthcare and residential assisted living facilities in the southeastern United States.

In 2006, after a meeting between Terrence Ross of RSA and Aldo Baccala, Baccala Realty entered into a "letter agreement" with RSA in which RSA agreed to assist the PSL Defendants with refinancing mortgages on the various properties and raising capital for improvements and operating expenses. On June 15, 2006, Aldo Baccala, on behalf of the PSL Defendants, signed the two-page letter agreement with RSA ("Letter Agreement"). (Declaration of James Goldberg, Dkt No. 40-2 ["Goldberg Dec."], Exh. 1.) The terms of the Letter Agreement provided that RSA would act "as sole underwriter and placement agent...in connection with the sale and placement (the "Transaction(s)") of taxable Variable Rate Demand Notes and/or other securities (the "Bonds")...."

---

[1] The Financial Industry Regulatory Authority, or FINRA, is a quasi-governmental organization that, among other things, regulates brokerage firms and exchange markets and arbitrates claims against FINRA members that arise out of their securities dealings. FINRA was established in 2007 when the National Association of Securities Dealers, Inc. ("NASD") and the New York Stock Exchange ("NYSE") consolidated their member-regulation operations into one self-regulatory organization. *See Karsner v. Lothian,* 532 F.3d 876, 879 n. 1, 880 (D.C.Cir.2008) (citing SEC Release No. 34-56145 (July 26, 2007)).

(*Id.*)  More specifically, RSA agreed to provide the services necessary for the sale and placement of the Bonds, including, in summary:

- Assisting in the preparation of an investment memorandum to be used in connection with the placement of any securities;
- Identifying, screening, and contacting prospective investors;
- Working on the various details necessary to complete the whole transaction with the PSL Defendants, its advisors, and other designated participants; and
- *"Providing such additional financial advice and services as [the PSL Defendants] may reasonably require."*

(*Id.*, emphasis supplied.)

Thereafter, and presumably to effectuate the PSL Defendants' goals, RSA structured and counseled the PSL Defendants to undertake a complex, sophisticated financing arrangement involving issuance of variable rate bonds. The financing structure contained four key components (collectively, the "Financing Deal"): (1) issuance of the bonds (as to which RSA acted as the underwriter); (2) a bond purchase agreement (pursuant to which RSA acted as the remarketing agent); (3) a letter of credit agreement with a backing financial institution; and, at the behest of the backing financial institution here, (4) an interest rate swap or hedge.[2]

*Components of the Financing Deal*

The first component of the Financing Deal called for PSL to issue approximately $51 million in floating, or variable rate, bonds to refinance its obligations and raise capital.  To effectuate this component, the PSL Defendants and RSA entered into a Bond Purchase Agreement. (Goldberg Dec., Exh. 39.)  Per the terms of the Bond Purchase Agreement, PSL was the "issuer" of the bonds and RSA was designated, notably, as *both* the "underwriter" and as the "remarketing agent" for the bonds.  (*Id.*)

---

[2] RSA argues that each component was independent of the other, not an integrated transaction.  The issue is addressed herein.

3

The second component of the Financing Deal, set forth both in the terms of the Bond Purchase Agreement and the Remarketing Agreement, established that RSA was authorized to purchase bonds from PSL at a discount and to make its best efforts to remarket them to third parties. (Goldberg Dec., Exhs. 39 and 40.) There is no indication in the record that the PSL Defendants investigated independently the terms or competitiveness of RSA's role as remarketing agent. As the sole remarketing agent, RSA had unfettered discretion to set interest rates on the bonds according to what it determined the market would require to sell the Bonds at par, and to make that decision on a weekly basis. (Goldberg Dec., Exh. 40 and 50.) The interest rate on the bonds, as set by RSA, was not required to be tied to any standard, such as LIBOR or a U.S. Treasury index.[3] Under this component of the Financing Deal, RSA received a fee for each bond sold. The PSL Defendants were obligated to pay the third-party purchasers of the Bonds, according to the weekly rate set by RSA, upon the sale of the Bonds.

The third component of the Financing Deal required letters of credit. To enhance the marketability of the Bonds, RSA recommended that the Bonds be secured with a "credit enhancement" in the form of letters of credit ("LOCs"). The Bond Purchasing Agreement required, as a condition of RSA's agreement to act as the remarketing agent, that PSL ensure the LOCs were in full force and effect at the time of closing. (Goldberg Dec., Exh. 39 at §5(b)(iii).) RSA advised the PSL Defendants that the interest rate on the Bonds would be directly related to the LOC bank's credit rating. (Goldberg Dec., Exh. A at 44:22-45:17.) Since an investor buying a bond can tender the bond for cash on any interest-reset date, if the bond is backed by LOCs (which require the bank to pay on the bond until a new investor buys it), the investment for the buyer is less risky. A less risky investment translates to a lower interest rate paid out. As a corollary, an issuing bank's poor

---

[3] LIBOR is an acronym for the London Interbank Offered Rate.

credit rating translates into higher risk of nonpayment, and the higher the risk of nonpayment on the bond, the higher the interest rate on the bonds would have to be for buyers to be willing to invest.

Wachovia Bank, N.A. (the "Bank")[4] was one of the possible backing financial institutions that RSA found for the transaction. It ultimately issued LOCs to back the Bonds, secured by the PSL Defendants' real property and other assets. To obtain this proposed "credit enhancement" on the Bond issuance, the Bank required its own credit enhancement. Specifically, the Bank required that PSL agree to pay a flat rate of 1.25% of the face value of the LOCs and, if the LOCs were drawn upon, to pay an additional amount of interest on the amount drawn, accruing at a rate of LIBOR plus 2.25%. It is notable that the arrangement did not require the Bank to maintain a satisfactory credit rating.

The fourth and last component of the Financing Deal was also tied to the issuance of the LOCs. The Bank presented PSL with a term sheet for the LOCs dated May 25, 2007 ("Term Sheet"). In that Term Sheet, the Bank conditioned the issuance of the LOCs on an interest rate swap as follows: "[b]orrowers will be required to enter into an interest rate protection agreement that at a minimum would cap the interest rate at closing." (Goldberg Dec., Exh. 46.)

*Advice Regarding the Hedge/Swap*

Upon receipt of the Term Sheet, PSL's chief financial officer, Matt Nizibian ("Nizibian"), immediately forwarded it to RSA for review. RSA's Brian Nurick ("Nurick") responded, on Sunday, May 27, 2007, via email, that the interest rate hedge might subject PSL to a termination fee if terminated prior to the ten-year term. (Goldberg Dec., Ex.17, Ex. D at 93:7-21.)[5] On Wednesday

---

[4] Unless otherwise specifically stated, all references to "the Bank" refer to Wachovia Bank, N.A. Wachovia Bank, N.A. was subsequently taken over by Wells Fargo Bank, N.A.

[5] The Court notes that the times indicated on the emails do not clearly distinguish whether they reflect Eastern time or Pacific time. As much as possible, the facts stated here reflect what

5

May 30, 2007, Nizibian emailed Nurick that the Bank would be sending over some options in the next few days and that he would "forward [Nurick] his write-up to review and advise." (Goldberg Dec., Exh. 18.) Nurick's response was "ok, will wait to hear back from you. Thanks. BN" (*Id.*)

Nurick initiated an email to Nizibian on Monday, June 4, 2007, asking "[a]ny update? Itching to get this one done. . ." (Goldberg Dec., Exh. 19.) Early on the morning of June 6, 2007, Nizibian forwarded to Nurick the information he had received from the Bank the day prior about the interest rate hedging alternatives. He relayed that PSL would be sending the signed term sheets to Wachovia "tomorrow" and asked Nurick to review which of "the interest rate hedging alternatives sent by Brant McDuffie ["McDuffie"] from Wachovia" was best and to suggest "any other alternatives … may be more appropriate in our situation." (Goldberg Dec., Ex. 20 and Ex. D at 38:14-39:12.) He also noted that he would be forwarding that night some additional information that McDuffie had sent later in the day on June 5, and that McDuffie had indicated that Nurick himself could call McDuffie directly with additional questions about alternatives. (Goldberg Dec., Exh. 20.) The Bank presented two main options: an interest rate hedge or "swap," and an interest rate "collar." (Goldberg Dec., Exh. 20 and Exh. D. at 125:14-22.)

Thereafter, and shortly before 8:00 a.m. on June 6, Nurick sent an email to Nizibian saying "We should talk. I think the swap might be the best option, but we need to make sure to see where they are pricing to mid. Our swap guy can work on this." (Goldberg Dec., Exh. 25.) Around 8:30 a.m. on June 6, Nurick received and responded to an email from bond counsel on the transaction who indicated that "[The Bank]'s lawyer called me and said the term sheet has been signed," to

---

appears from the documents to be the chronological order of the communications, and a reasonable estimate of the relative time.

which Nurick responded, "OK. *The hedge part is still an issue.* I think we will need to do a swap and *negotiate* a call provision." (Goldberg Dec., Exh. 24, emphasis added.)[6]

Later in the day on June 6, Nurick called McDuffie to see if the Bank might be agreeable to a "call" feature that would allow the PSL Defendants to terminate the hedge prior to the ten-year term without paying a termination fee. (Goldberg Dec., Ex. D at 102:21-103:10, 109:11-24, 122:1-4.) McDuffie said the Bank would not agree to a call feature and that the PSL Defendants had already agreed to enter into a ten-year swap as an interest rate hedge. (Goldberg Dec., Ex. D at 124:10-125:7.) Later, in the evening of June 6, Nurick emailed Nizibian to say that he "had a good talk today with Brant [McDuffie]. We agree on the swap arrangement being the best option. I want to run some things through my swap guy, but nothing that would slow this train down. We are ready to proceed." (Goldberg Dec., Ex. A 140:19-141:4 and Ex.27.)[7]

The agreed-upon swap provision functioned as follows: Under the financing structure, when the LOCs were drawn upon, the Bank received interest at a rate of <u>LIBOR plus 2.25%</u> on the face amount drawn. The Bank, presumably concerned about the fluctuations of LIBOR, negotiated a "hedge" against those fluctuations with an interest rate "swap." Through the "swap," every time LOCs were drawn upon, the PSL Defendants agreed to pay the Bank a fixed amount of <u>5.71%</u> on the face amount, and the Bank agreed to pay back the LIBOR rate. Hence, the parties "swapped" a

---

[6] There is some dispute in the testimony about who signed off on the term sheet and when, or more specifically whether the term sheet was signed by PSL before RSA gave its opinion. While they might ultimately bear on the merits of the dispute, the Court finds that these facts are not material to the matters at issue here: whether PSL was RSA's customer. The material facts are those concerning whether RSA gave its opinion or advice about the swap in response to the request of Nizibian, not whether PSL acted consistent with that advice or request for advice. RSA's objections to the admissibility of the deposition testimony and documentary evidence of its advice on the swap are without merit and are overruled.

[7] Thereafter, drafts of the various agreements referenced herein were circulated among Nurick, Nizibian, and McDuffie, as well as others. (*See e.g.,* Goldberg Dec., Exh. 28 and 29.)

7

fixed 5.71% for the variable LIBOR rate. Stated differently, because the Bank was paying the LIBOR rate back to the PSL Defendants and they, in turn, were paying a fixed rate of 5.71% to the Bank, the LIBOR rate cancelled out relative to the Bank leaving it with a fixed sum of 5.71% plus the original 2.25% due upon the face amount drawn from the LOC. In this manner, the PSL Defendants would undertake the risk (good or bad) of changes in LIBOR.

*RSA's Compensation for the Financing Deal*

RSA's compensation was contingent on closing of the entire Financing Deal. (Goldberg Dec., Exh. A at 47:16-48:1.) Once the Financing Deal closed, RSA received compensation arising from the different components of the overall deal. In terms of its compensation "for acting as a financial advisor to [the PSL Defendants] pursuant to th[e] Letter Agreement," it received a fee equal to three-forth [sic] of one percent (3/4 of 1%) of the gross, or par amount of the Transaction," the "Transaction" being defined as the sale and placement of the Bonds. (Goldberg Dec., Exh. 1.) It also received fees related to the remarketing of the Bonds, an underwriters' discount on the bonds it purchased, and an additional annual fee from the PSL Defendants of 0.01% of all Bonds outstanding. (Goldberg Dec., Exh. 39 and 40.) The entire transaction closed as of July 31, 2007.

A little over a year later, the financial markets began to fail, the Bank became insolvent, and its credit rating plummeted. Soon, bond investors tendered their bonds for cash or were unwilling to hold on to the bonds unless a higher interest yield was paid to reflect the additional risk of nonpayment.

*The Proposed Arbitration Claim*

On July 29, 2011, the PSL Defendants filed a claim in arbitration with FINRA based upon its contention that it was RSA's customer and therefore entitled to arbitrate under FINRA rules. (Goldberg Dec., Exh. 2.) The claim alleges that RSA failed to disclose the risks inherent in the

swap condition of the Wachovia LOC as part of the Transaction. It further alleges that "[rather than a standard variable interest rate, such as LIBOR plus an applicable credit spread, the variable interest rate was determined solely at the discretion of RSA. . . this unorthodox methodology for determining the Bond Rates exposed the PSL Defendants to massive volatility and risk with respect to its financing costs." (*Id.* at p. 3, ¶8.) The PSL Defendants allege that the combination of the "unorthodox" interest-setting method, combined with the interest rate hedge built into the LOCs, meant that the PSL Defendants' financing costs were much higher than if they had stuck with more conventional financing, and the costs were bound to be higher regardless of whether market interest rates went up or down. (*Id.* at ¶ 11-16.) The PSL Defendants further argue that RSA had a duty to advise the PSL Defendants of the practical implications of the deal it was recommending. (*Id.* at ¶ 18.) The PSL Defendants seek over $10 million in damages allegedly incurred as a result of the Transaction.

## STANDARDS APPLICABLE TO THIS MOTION

Since a decision compelling arbitration would moot the motion for a preliminary injunction to stop that arbitration, the Court addresses the PSL Defendants' motion first. A petition or motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, is heard in the same manner as a motion. "When considering a motion to compel arbitration, a court applies a standard similar to the summary judgment standard of Fed.R.Civ.P. 56." *Concat LP v. Unilever, PLC,* 350 F.Supp.2d 796, 804 (N.D.Cal.2004). However, federal courts are required to enforce agreements to arbitrate vigorously, according to their terms, and to resolve ambiguities in favor of arbitration. *See Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 582 (2008); *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 476 (1989). "The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it

does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1130 (9th Cir.2000).

Generally, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000). However, where the issue is whether there exists an agreement to arbitrate, the party seeking to enforce an arbitration agreement bears the burden of showing that it exists. *Alvarez v. T-Mobile USA, Inc.*, 2011 WL 6702424 (E.D. Cal. Dec. 21, 2011), citing *Sanford v. Memberworks, Inc.,* 483 F.3d 956, 962 (9th Cir.2007). Only when there are no disputed issues of material fact as to the existence of a binding agreement should the court rule on the question of compelling arbitration. *Id.* citing *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.* 925 F.2d 1136, 1140-41 (9th Cir. 1991). When the party opposed to arbitration does so on the ground that no binding agreement to arbitrate exists, the district court should give the opposing party the benefit of all reasonable doubts and inferences that may arise. *Concat LP, supra,* 350 F.Supp.2d at 804.

## DISCUSSION

The rules applicable to FINRA members provide for arbitration of any dispute, claim or controversy arising out of the conduct of members or associated persons. *See* FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Rules") 12100, 12200.[8] Rule 12200 provides:

> Parties must arbitrate a dispute under the Code if:
> • Arbitration under the Code is either:
>     (1) Required by a written agreement, or
>     (2) Requested by the customer;

---

[8] The Court notes that FINRA's Code of Arbitration Procedure has two separate codes, one governing arbitrations between customers and broker/dealers (Rules 12000 *et seq.*) and one governing arbitrations between or among industry parties, including arbitration of the claims of FINRA members and their employees (Rules 13000 *et seq.*). The Customer Code is the only set of rules at issue in these proceedings.

10

> • The dispute is between a customer and a member or associated person of a member; and
>
> • The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Rule 12200. "[E]ven if 'there is no direct written agreement to arbitrate ..., the [FINRA] Code serves as a sufficient agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants.'" *O.N. Equity Sales Co. v. Steinke*, 504 F.Supp.2d 913, 916 (C.D.Cal., 2007) (quoting *MONY Secs. Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004)). "The interpretation of the arbitration rules of an industry self-regulatory organization (or "SRO") such as FINRA is similar to contract interpretation. . . [differing only] in that any doubts concerning the *scope* of arbitrable issues should be resolved in favor of arbitration." *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011) *cert. denied* 2012 WL 985310 (U.S. May 21, 2012) (emphasis added, internal citations omitted).

Here, there is no question that RSA is a FINRA member or that no written agreement to arbitrate exists between RSA and the PSL Defendants. Thus, the issue of whether arbitration should be compelled depends upon whether the PSL Defendants are the "customers" of RSA (i.e. the existence of an agreement) and whether the dispute arises in connection with the business activities of RSA (i.e. the scope of the agreement). The Court therefore applies the summary judgment-type standard to the customer question.[9]

---

[9] RSA, in its briefing, proposes a two-part test for "customer" status: (1) that there is a brokerage/investment relationship; and (2) that the business activities performed for the purported customer are related to brokerage or investment services. The proposed test seems to confuse the separate inquiries in Rule 12200 – whether the party seeking to arbitrate is a customer of the member, and whether the "dispute arises in connection with the business activities" of the member. Regardless, both inquiries must be satisfied before arbitration under FINRA is ordered.

11

Rule 12100(i) of FINRA Code of Arbitration only minimally defines the term "customer," stating that a "customer" is someone who is not a broker or a dealer. It does not define the terms "broker" or "dealer," but refers to its "members" as "any broker or dealer admitted to membership in FINRA." Rule 12100(o). The Securities Exchange Act of 1934 Act defines "broker" as "any person engaged in the business of *effecting transactions in securities* for the account of others," and defines "dealer" as "any person engaged in the business of buying *and selling securities* for his own account, through a broker or otherwise." 15 U.S.C. §78c (a)(4), (5) (emphasis added). While the Act uses the term "customer," it does not define it.

Similarly, the Ninth Circuit has not defined the term "customer" either in the context of the current FINRA Rules or the predecessor NASD Rules from which they were derived.[10] However, cases in this district and outside the circuit have stated that "the term 'customer' should not be too narrowly construed, nor should the definition upset the reasonable expectations of FINRA members." *Herbert J. Sims & Co. v. Roven,* 548 F.Supp.2d 759, 764 (N.D.Cal.2008) (citing *Oppenheimer v. Neidhardt,* 56 F.3d 352, 357 (2d Cir. 1995); *Wheat, First Sec. Inc. v. Green,* 993 F.2d 814, 820 (11th Cir. 1993)). A direct customer relationship is not necessary so long as there is "some nexus" between the purported customer and the FINRA member. *Goldman Sachs & Co. v. Becker*, 2007 WL 1982790, at *6 (N.D.Cal., July 2, 2007) (quoting *Malak v. Bear Stearns & Co., Inc.* 2004 WL 213014 at *4 (S.D.N.Y., February 4, 2004); *see also Fleet Boston Robertson Stevens, Inc. v. Innovex, Inc.,* 264 F.3d 770, 772 (8th Cir. 2001).

Cases in this district have found that no customer relationship was established when investors could not show that the FINRA member provided any financial services related to the

---

[10] Rule 12200 of the Code is the FINRA version of former NASD Rule 10301 that went into effect on April 16, 2007. Cases interpreting and apply Rule 10301 apply equally to Rule 12200 since there was no substantive change to the rule. *See Herbert J. Sims & Co., Inc. v Roven*, 548 F.Supp.2d 759, 763 n.2 (N.D.Cal. 2008).

buying or selling of securities directly to those investors.  In *Brookstreet*, investors who did business with an investment firm that held an account at the Brookstreet firm were not the "customers" of Brookstreet, even if the accountholder might have been Brookstreet's customer, or the investors might have been the accountholder's customer – the relationship between the claimants and the Brookstreet firm was simply too removed.  *Brookstreet, Sec. Corp. v. Bristol Air, Inc.*, 2002 U.S. Dist. LEXIS 16784, *25 (N.D. Cal. August 5, 2002.)  Similarly, in *Goldman Sachs*, investors who purchased securities from Prudential were not "customers" of Goldman Sachs where evidence showed that Goldman Sachs only acted as the underwriter for Prudential on an unrelated initial public offering.  *Goldman Sachs & Co. v. Becker*, 2007 WL 1982790 (N.D. Cal. July 2, 2007).  Likewise, investors were found not to be the "customers" of a clearinghouse firm (Sims) that merely sold bonds to the investment advisor from whom the investors ultimately purchased them.  As the court there stated, Sims "never provided any investment services or other services to any of the Investors[,] has never received any payments of money from them [, and. . .] knew nothing about the Investors. . . until it was served with the Statement of Claim."  *Herbert J. Sims & Co., Inc. v. Roven*, 548 F. Supp. 2d 759, 765-66 (N.D. Cal. 2008).  In each of these cases, the connection between the claimants and the FINRA member they sought to compel to arbitration was too distant for the court to find a "customer" relationship.  However, no case in this district has addressed the situation here, that is, a situation where the connection between the purported customer and the FINRA member is undisputedly direct, but the "customer" is a purchaser of services related to the issuance and sale of securities rather than an investor in securities.

Other courts have addressed such a relationship.  In *Patten Securities*, the Third Circuit held that an issuer of securities was a customer of its underwriter for purposes of the NASD (now FINRA) arbitration rules.  *Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc.*, 819

F.2d 400 (3d Cir. 1987), abrogated on other grounds, *Delgrosso v. Spang & Co.*, 903 F.2d 234, 236 (3d Cir. 1990). The case relied primarily on an NASD interpretive statement issued during its 1983 annual meeting, which said that "[a]n issuer of securities should be considered a public customer of a member firm where a dispute arises over a proposed underwriting." *Id.* at 406.[11] The Third Circuit held that the interpretive statement was controlling since it was not arbitrary or subjective and it was not in conflict with the broad definition of "customer" in the NASD rules, which excluded only other brokers and dealers from its bounds. *Id.*

The more recent decision in *J.P. Morgan Securities, Inc. v. Louisiana Citizens Property Ins. Corp.,* 712 F.Supp.2d 70 (S.D.N.Y. 2010), likewise found that an issuer of bonds was a customer of a FINRA member that was acting as its underwriter. In *J.P. Morgan*, Louisiana Citizens Property Insurance Corporation ("Citizens") issued three hundred million dollars in municipal bonds termed auction-rate securities or ARS bonds. *Id*. at 72-73. JP Morgan and Bear Stearns acted as co-lead underwriters and advised Citizens on the bond structure and related issues. *Id*. As part of the transaction, Citizens entered into interest hedge/swap agreements with entities separate from, but apparently related to, JP Morgan and Bear Stearns as part of the transaction. *Id.* at 73, 79. In the case of ARS bonds, the variable interest rate is determined through periodic "Dutch auctions," wherein the rate set at a rate representing the lowest rate at which sufficient purchasers are willing to purchase all securities at the time of the auction. *Id.* Citizens sought to arbitrate its claim that J.P. Morgan and Bear Stearns manipulated the market for the ARS by submitting blanket bids that effectively capped the interest rate at a level favorable to them.

---

[11] RSA's objection that the interpretive statement was not offered into evidence and would not be admissible because it is hearsay are overruled. The Court is relying on the Court of Appeal's recitation of its opinion regarding the meaning of the agency's rules based on the agency's interpretive guidance.

14

The court in *J.P. Morgan* concluded that Citizens was a customer based on the old NASD interpretive statement and *Patten*. *Id.* at 78-79. While acknowledging that "this interpretive statement is no longer binding," the court there found that it "[n]evertheless. . . remains the most compelling evidence of whether FINRA's compulsory arbitration rule is intended to cover disputes between underwriters and issuers." *J.P. Morgan , supra,* 712 F. Supp. 2d 70 at 77-78; *see also Herbert J. Sims, supra*, 548 F.Supp.2d at 763 n.2 (cases interpreting former NASD rule apply equally to Rule 12200 since there was no substantive change to the rule). Finding unpersuasive J.P. Morgan's and Bear Stearns' arguments that customer status should only be extended to investors, the court determined that any ambiguities in the definition of "customer" should be interpreted in favor of compelling arbitration, and that Citizens was their customer. *Id.* at 78-79. It further decided that the alleged conduct of failing to inform Citizens that the ARS auctions would fail without their blanket bids, thus effectively controlling the interest rates on the bonds, related directly to their role as underwriters and constituted "business activities of the member" under FINRA Rule 12200. *Id.* at 79.

This Court agrees that, while the interpretive statement relied on by the court in *Patten* has not been revisited since the NASD became reorganized as FINRA, the statement is the only clear indicator as to whether a FINRA member reasonably would expect that an underwriter/issuer agreement may give rise to a "customer" relationship. *Cf. Herbert J. Sims, supra,* 548 F.Supp.2d at 764 (customer definition should not upset the "reasonable expectations of FINRA members"). Moreover, and similar to those in *J.P. Morgan*, the facts here show that the relationship between the PSL Defendants and RSA was more than a mere agreement that RSA buy and resell the bonds, but extended to RSA's advising and arranging the entire bond transaction, including provision of such "financial advice and services to PSL as it might reasonably require" in connection with that

transaction. (RSA Exh. A, Nizibian Depo., at Exh. 1.) The PSL Defendants allege that RSA failed to advise them of the risks inherent in the bonds' interest-setting structure, particularly in combination with the swap/hedge agreements. In addition, while RSA now disavows offering any advice on the swap options, the evidence clearly indicates that it did so.[12] Nothing in the Letter Agreement contemplates that RSA would not provide advice on this aspect of the transaction. Whether or not a swap agreement is a necessary component of an LOC, or an adjustable rate bond transaction, the swap agreement here was clearly a necessary element of the transaction on which RSA was advising the PSL Defendants.

RSA argues that merely providing financial advice is not enough to give rise to a customer relationship when the advice is not given about investments, citing *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770 (8th Cir. 2001). The Eight Circuit there held that a company receiving only financial advice from a FINRA member about a corporate merger, but no brokerage or investment services in connection with that merger, was not a "customer" of the member for purposes of FINRA. *Id*. at 772-73. However, the case acknowledged that the meaning of "customer" is not limited exclusively to "investor," noting that an underwriter/issuer relationship was "still related directly to the issuance of securities," and thus went beyond mere provision of financial advice. *Id.* at 773 n.3 (citing *Patten*). Indeed, this "investors only" argument was soundly

---

[12] RSA contends that it was not acting as the PSL Defendants' advisor with respect to the swap option and that PSL agreed to the swap without waiting for its advice. The contemporaneous email evidence is to the contrary. On Wednesday May 30, 2007, Nizibian emailed Nurick that Wachovia would be sending over some options in the next few days and that he would "forward [Nurick] his write-up to review *and advise*." (Goldberg Dec, Exh. 18, emphasis added) Nurick's response was "ok, will wait to hear back from you. Thanks. BN" (*Id.*) Nurick did not say that he was not going to advise PSL about the swap options. Nurick continued to research the options and provide his advice. Nurick's continued work on the matter indicates that the decision about which swap option PSL should take was not final as of June 7, 2007. Further, it is the fact of his undertaking to provide advice, and not whether PSL took that advice or acted before receiving it, that is important here.

16

rejected in a more recent decision of the Second Circuit, *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 660 F.3d 643 (2d Cir. 2011), wherein the court stated that:

> We [ ] reject [the] contention that FINRA has a narrow "investor-protection mandate," such that "customers" should include only those receiving "investment or brokerage services." FINRA's purposes are not limited to investor protection. Rather. . . FINRA serves as the sole self-regulatory organization chartered under the Exchange Act and exercises comprehensive oversight of the securities industry.
> *Id.* (internal citations omitted).

*Id.* at 652 (internal citations omitted). *UBS Financial Services, Inc. v. West Virginia Univ. Hospitals, Inc.,* 760 F.Supp.2d 373 (S.D.N.Y. 2011), aff'd in part, vacated in part by *UBS Financial Services, Inc. v. West Virginia Univ. Hospitals, Inc.,* 660 F.3d 643 (2d Cir. 2011). Thus the authorities do not favor limiting the customer definition to investors.

RSA further argues that an underwriter/issuer relationship cannot, as a matter of law, give rise to a "customer" relationship because it is an agreement made on an "arms-length basis," establishing no fiduciary duties as between the underwriter and issuer. For this proposition, RSA cites *In re Wicat Sec. Litig.*, 600 F. Supp. 1236 (D. Utah 1984). The argument is disingenuous for several reasons.

First, *In re Wicat* did not involve the FINRA definition of customer, but rather the question of whether an issuer of securities could be held liable for misrepresentations made to investors by its underwriters. *Id.* at 1240. The court there found that "an issuer is not liable, as a matter of law, to a securities purchaser who purchased the securities from an underwriter where there is no relationship between the issuer and underwriter other than a firm commitment underwriting agreement." *Id.* However, in the context of so finding, it noted that "[t]here are no allegations that the underwriters were acting as agents of [the issuer], which would be the case if the arrangement was a "best efforts" underwriting." *Id.* In other words, the label of underwriter/issuer itself was not determinative of the parties' responsibilities and relationship.

17

Second, as RSA's Brian Nurick testified, the level of involvement and advice varies between different types of underwriting transactions. (Goldberg Dec., Exh. D at 26:7-20.) Competitive sale underwriting transactions are the "arms-length" variety, while negotiated sale underwriting transactions would mean that the underwriter structured, purchased and sold the securities, as well as providing advice to the issuer about interest rates and terms and the effect of credit ratings on the interest rate. (*Id.* at 26:19-29:13.) The underwriting transaction here was a negotiated transaction. (*Id.* at 29:13-17.) RSA plainly acted as the "broker" for the PSL Defendants by "effecting a transaction in securities," *to wit*, structuring the Bonds and then purchasing and selling them, for a fee paid by the PSL Defendants.

Contrary to RSA's argument, the transaction at issue did not merely contain a series of independent, arm's length components. While such transactions exist, and, if so, may change the analysis, here the Letter Agreement, as well as the other evidence, establishes that RSA agreed to work on, and provide advice on, the whole transaction. Further, RSA structured the transaction from the outset to act as underwriter, remarketing agent, and advisor.

Finally, nothing in the FINRA definition precludes a finding of a customer relationship arising from arms' length transactions *per se*. *Cf. UBS Fin. Services, Inc. supra*, 660 F.3d at 652 ("we reject UBS's contention that a customer relationship requires a fiduciary relationship and cannot be founded on arm's-length transactions. UBS points to no support for this limitation in the text or structure of the FINRA Rules"). [13]

---

[13] RSA cites to law governing the establishment of a national securities association in support of the notion that FINRA is established to register and regulate the investment activities of brokers and dealers *vis a vis* investors only. However, the provision RSA cites, 15 USC § 78o-3(b)(4), seeks to insure fair representation by requiring that one or more directors be representative of "*issuers* or investors." This further lends support to the notion that the protections in the statute are meant to apply not only to investors, but also to issuers of securities, as here.

## CONCLUSION

"The term 'customer' includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." *UBS Fin. Services, supra*, 660 F.3d at 650. The applicable authorities hold that the term 'customer' "should not be too narrowly construed, nor should the definition upset the reasonable expectations of FINRA members." *Herbert J. Sims & Co., supra,* 548 F.Supp.2d at 764. Here, the undisputed evidence shows that the PSL Defendants purchased from RPS investment advice and financial services in connection with the creation and sale of securities. Given that the definition of "customer" is written broadly enough to encompass the relationship here, and the only objective indicator of the "reasonable expectations" of FINRA members directs that the type of relationship here would be encompassed in the definition of "customer," the Court finds that arbitration pursuant to FINRA Rule 12200 must be compelled.

Therefore, the PSL Defendants' motion to compel arbitration is **GRANTED** and RSA's motion for preliminary injunction is **DENIED**. Plaintiffs are ordered to arbitrate all disputes submitted to FINRA as stated in the PSL Defendants' claim in arbitration.

This action is **STAYED** during the pendency of the arbitration.

**IT IS SO ORDERED.**

Dated: June 27, 2012

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**